FILED

2014 Mar-13  AM 10:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **DANA L. PRUITT,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 6:13-cv-1250-CLS** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Dana Pruitt commenced this action on July 3, 2013, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying her claim for a period of disability, disability insurance, and supplemental security income benefits. For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th

Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically, claimant asserts that the ALJ improperly considered the opinions of the treating, examining, and consultative medical providers, and improperly considered claimant's failure to follow prescribed treatment. Upon review of the record, the court concludes that those contentions are not correct.

## A.    Medical Opinions

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal citations omitted). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id*. (alterations supplied). Additionally, the ALJ is not required to accept a conclusory statement from a medical source, even a treating source, that a claimant is unable to work, because the decision whether a claimant is disabled is not a medical opinion, but is a decision "reserved to the Commissioner." 20 C.F.R. § 416.927(e). Social Security regulations also provide that, in considering what weight to give *any* medical opinion (regardless

of whether it is from a treating or non-treating physician), the Commissioner should evaluate:  the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors.  *See* 20 C.F.R. § 404.1527(d).  *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Dr. Brian Thomas, a clinical neuropsychologist, conducted a consultative examination on December 10, 2010.  Dr. Thomas noted that claimant had no history of mental health treatment, but had instead been prescribed mental health medications by her medical doctors.  On examination, Dr. Thomas noted the following:

> Claimant was oriented x4.  Speech was adequate.  Claimant was able to learn a 4 word list.  Hallucinations are denied.  Delusions are denied.  Ability to compute mental calculation was adequate.  Claimant is able to recite 5 digits forward and 4 digits backward suggesting adequate concentration.  Verbal abstraction was adequate as assessed through verbal conceptualization.  Judgment was poor when required to solve basic verbal problems.  Remote memory appeared adequate when asked to recall relevant autobiographical information.  Recent memory appeared adequate when asked to recall the claimant's own social security number.  Claimant was able to recall 4 of 4 unrelated words following a brief delay without assistance suggesting adequate immediate memory.

Affect is dysphoric.  Mood is depressed and worried.

Claimant reports depressive symptoms including sleep impairment, anhedonia, feelings of guilt, feelings of worthlessness, impaired energy level, impaired concentration, appetite loss, but denies thoughts of death and denies plan/intent for suicide.  Depression has been ongoing since 2nd child's birth approximately 16 months ago.  She feels she's depressed because she has no control over things such as divorce, prior injury to her child's foot, etc.  She denies prior episode of depression.

She reports some social anxiety that she feels is excessive and marked by avoidance of social situations.[1]

Dr. Thomas's diagnoses were major depression and social anxiety disorder.  He also made the following functional observations:  "Ability to perform routine repetitive tasks appears adequate but persistence is questionable.  Ability to interact with coworkers appears questionable/poor.  Ability to sustain attention appears adequate.  Ability to handle funds if so assigned appears questionable.  Prognosis for improvement over the next 12 months appears fair with treatment."[2]

The ALJ afforded Dr. Thomas's opinion only little weight because it was "vague and gives no specific limitations."[3]  Additionally, Dr. Thomas did not state the evidence upon which he relied to form his opinion.  Moreover, Dr. Thomas's own mental status examination did not reveal disabling limitations.  Finally, Dr. Thomas was only a consultative examiner, and he appeared to have relied heavily on

---

[1] Tr. 271.

[2] *Id.*

[3] Tr. 23.

4

claimant's subjective reports and limitations.[4]

Dr. Alan Blotcky, a clinical psychologist, conducted a second consultative psychological evaluation on March 15, 2011. Claimant informed Dr. Blotcky that she had panic disorder without agoraphobia since age 11, and that she usually had three or four panic attacks every week. She also reported that she had been struggling with "constant and unwavering" depression for two years. She had been taking Zoloft and Klonopin, both of which were prescribed by her cardiologist, for four months, and she also was taking Xanax that was prescribed by her family physician. With regard to her daily activities, claimant reported spending most of her time caring for her sons and resting. She did not cook or do housework, but instead relied on her mother to perform those and other household functions for her. She did not have any hobbies or special interests, and while she had a driver's license, she did not have a car. She visited with her grandparents, a brother, and two friends on a regular basis.[5] During the mental status examination, claimant

> demonstrated logical and orderly thinking. Her speech was normal. Her abstract thinking was limited. Her memory functioning was accurate but a bit vague. Dana seemed sad and anxious to me. Her affect was restricted. She looked tired and worn. Many of her verbalizations were morbid in content. Her energy level was low. Dana is not psychotic. She does not have a thought disorder. This young woman's judgment is grossly intact. Her insight is fair.[6]

---

[4] *Id.*

[5] Tr. 294-95.

[6] Tr. 295.

On intellectual function testing, claimant obtained a Verbal Comprehension Index of 74, a Perceptual Reasoning Index of 75, a Working Memory Index of 77, a Processing Speed Index of 79, and a Full Scale IQ of 71, placing her at the lower end of the borderline range of intellectual functioning. She also earned a score of 39 on the Beck Depression Inventory, "indicating the presence of severe depression."[7] Dr. Blotcky assessed claimant with panic disorder without agoraphobia, severe depressive disorder, borderline intellectual abilities, multiple medical problems, and a GAF Score of 40, which indicates major impairment in several areas. Dr. Blotcky recommended that claimant should be placed under the care of a psychiatrist and psychologist, so she could receive a combination of medical therapy and individual counseling. He believed that claimant was motivated during the exam, and her test scores were valid. Her prognosis was very poor because of the combination of the two mental disorders she suffered, her limited intellect, and her physical problems. Even so, she would be able to manage her financial affairs independently.

Dr. Blotcky also completed a Medical Source Opinion Form (Mental) on March 24, 2011. He indicated that claimant had moderate impairment of her ability to use judgment in simple, one- or two-step, work-related decisions, her ability to understand, remember, and carry out simple, one- or two-step instructions, and her ability to maintain social functioning; marked impairment of her ability to respond

---

[7] Tr. 295-96.

appropriately to supervisors and co-workers, her ability to use judgment in detailed

or complex work-related situations, her ability to deal with changes in a routine work

setting, her ability to understand, remember, and carry out detailed or complex

instructions, her ability to respond to customary work pressures, and her ability to

maintain concentration or pace for periods of at least two hours; and extreme

impairment of her ability to respond appropriately to customers or other members of

the general public, and her ability to maintain activities of daily living. Once again,

Dr. Blotcky indicated that claimant could manage benefits in her own best interest.[8]

> The ALJ assigned *no* weight to Dr. Blotcky's opinion, because

> [h]e never treated the claimant and did not review the other medical
> evidence of record. The mental status exam and testing did not reveal
> findings that would account for these extreme limitations. As such, his
> opinion is not supported by the underlying evidence. The mental status
> exam was normal except for signs of depression and anxiety with limited
> abstract thinking. Dr. Blotcky noted she demonstrated logical and
> orderly thinking with accurate memory functioning. She did not have a
> formal thought disorder. Her judgment was grossly intact . . . . Dr.
> Blotcky apparently relied quite heavily on the subjective report of
> symptoms and limitations provided by the claimant, and seemed to
> uncritically accept as true most, if not all, of what the claimant reported.
> Yet, as explained elsewhere in this decision, there exist good reasons for
> questioning the reliability of the claimant's subjective complaints.

> Dr. Blotcky's opinion is conclusory, providing very little
> explanation of the evidence relied on in forming that opinion. He merely
> checked off boxes on a form and did not provide a narrative report
> containing specific clinical findings. Even with these alleged extreme

---

[8] Tr. 298-99.

and marked limitations, including "extreme" limitations in activities of daily living, Dr. Blotcky found the claimant could manage benefits in her best interest which is inconsistent and gives his opinion less weight.  As Dr. Blotcky noted, the claimant was not seeking mental health treatment, which would have improved her functioning and mental status.  The claimant underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, which provided her with motivation to exaggerate her symptoms.  She reported much more extreme activities of daily living with Dr. Blotcky than at the consultative examination a few months earlier.  Dr. Blotcky's opinion is without support from the other evidence of record, which renders it less persuasive.  I specifically point out, however, that I do not discount Dr. Blotcky's opinion because it was paid for by the claimant. . . .  Rather, I discount it because he relied on the claimant's complains without question, and even the tests he himself administered do not support his extreme findings.[9]

Dr. Keith Morrow, D.O., claimant's treating family physician, provided a sworn statement on December 13, 2011.  He testified that his office records, including those pertaining to claimant's medical history, had been lost in a tornado several months earlier.[10]  Even so, Dr. Morrow had reviewed the reports from Dr. Alan Blotcky and Dr. Brian Thomas regarding claimant's mental limitations.  He agreed that Dr. Blotcky's assessment reflected that claimant experienced a panic disorder, depressive disorder, and borderline intellectual abilities.[11]  He also concurred with Dr. Blotcky's opinion that claimant had marked limitation of her ability to respond to customary work pressures, and her ability to maintain attention, concentration and pace for

---

[9] Tr. 24-25 (alteration supplied).

[10] Tr. 312-14.

[11] Tr. 315.

periods of at least two hours.  He also concurred with Dr. Thomas's opinion that claimant's ability to interact with coworkers was questionable or poor.[12]  Finally, Dr. Morrow agreed with counsel's suggestion that claimant could not function competitively in the workplace as a result of her mental health limitations.[13]  With regard to claimant's prognosis, he stated that her intellect was not likely to improve, and that

> [h]er anxiety and depression, since it's been a significant factor in her life for several years, may be controllable, but it would still prohibit her from doing complex tasks.  She would have difficulty interacting with other workers.  She would not be able to work in a job that had significant pressure and shouldn't work in a job that had exposure to the public.[14]

The ALJ afforded Dr. Morrow's opinion "some" weight, due to his long-term treating relationship with claimant and his ability to personally assess claimant's subjective complaints.[15]  Even so, Dr. Morrow's opinion did not receive controlling weight because he was a family doctor, not a mental health specialist, and he did not review the other medical reports in the record.  The ALJ also did not think that Dr. Morrow had treated claimant as aggressively as would be expected for a totally disabled person.  Finally, the ALJ did not accept Dr. Morrow's statement that claimant was unable to work to some extent, because that determination is reserved for the

---

[12] Tr. 316.
[13] Tr. 18.
[14] Tr. 18-19 (alteration supplied).
[15] Tr. 25.

Commissioner.  Even so, the ALJ did accept some of the specific limitations assessed by Dr. Morrow, and she incorporated those limitations into her residual functional capacity finding by limiting claimant to simple, routine, and repetitive tasks in a low stress job with only occasional decision-making, occasional changes in the work setting, and occasional interaction with the public and co-workers.  The ALJ also noted that Dr. Morrow's testimony consisted primarily of summary responses to the leading questions of claimant's counsel about claimant's allegedly disabling conditions.[16]

The ALJ gave great weight to the opinions of the state agency medical consultants.  On December 14, 2010, Dr. Robert Estock completed a Psychiatric Review Technique form, on which he indicated that claimant suffered from major depression[17] and social anxiety.[18]  As a result of those conditions, she would experience moderate restriction of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  She might experience one or two extended episodes of decompensation.  Dr. Estock based his assessment on a review of the record, including Dr. Thomas's opinion.[19]  On a Mental Residual Functional Capacity Assessment form, Dr. Estock

---

[16] Tr. 25-26.

[17] Tr. 277.

[18] Tr. 279.

[19] Tr. 284-86.

indicated that claimant would be moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to respond appropriately to changes in the work setting.  She would otherwise suffer no significant mental limitations.[20]  Dr. Estock gave the following recommendations:

> A.  Claimant would be expected to understand, remember, and carry out short simple instructions and tasks but would likely have difficulty with more detailed tasks and instructions.

> B.  Claimant would likely have trouble with more detailed tasks and instructions.  Claimant would be expected to maintain attention and concentration for 2 hours with all customary rest breaks.  A well-spaced work environment would be best for maximum concentration.  Claimant would likely miss 1-2 days/month due to psych symptoms.

> C.  Contact with the public should be infrequent and non-intensive.  Supervision should be tactful and constructive and non-threatening.

> D.  Changes in the workplace should be infrequent and gradually introduced.[21]

---

[20] Tr. 288-89.

[21] Tr. 290.

With two exceptions, the ALJ found that Dr. Estock's opinion was "consistent with the objective medical evidence of record and the claimant's alleged activities of daily living."[22] She did not, however, credit Dr. Estock's opinion that claimant would likely miss one to two days of work each month because it was conclusory and unsupported by other medical evidence. She also did not credit Dr. Estock's notation that claimant had experienced one or two episodes of decompensation, because there was no indication in the record that claimant ever sought any kind of mental health treatment, much less an extended psychiatric hospitalization.[23]

The ALJ also was persuaded by the opinions of Dr. Mark Oberlander, a clinical psychologist who testified as a mental health expert during the administrative hearing. Dr. Oberlander largely agreed with Dr. Estock. He testified that claimant would have the ability to engage in simple, repetitive activities, but she could not understand, execute, or remember complex or detailed instructions. Claimant would have moderate impairment of her ability to maintain attention and concentration, her capacity to engage in work activities that require a rapid pace, her ability to interact appropriately with the general public, her capacity to accept instructions and respond appropriately to criticism from supervisors, and her ability to accept realistic goals and make plans independently of others. She could tolerate occasional independent

---

[22] Tr. 24.

[23] *Id.*

decision making, occasional changes in the work setting, and occasional interaction with members of the public.  She would have moderate impairment of activities of daily living, appropriate social interactions, and attending, concentrating, and remembering.[24]  The ALJ found that Dr. Oberlander's opinions were consistent with the other evidence of record.  She also was persuaded by Dr. Oberlander's specialty in clinical psychology, his decades of professional experience, and his ability to review the entire record and hear claimant testify.  The ALJ gave "great weight" to the restrictions imposed by Dr. Oberlander and accommodated them by restricting claimant's residual functional capacity to "simple, routine, and repetitive tasks in a low stress job with only occasional decision making required and only occasional changes in the work setting, as well as limiting the claimant to only occasional interaction with the public and with co-workers."[25]

Upon review of the ALJ's findings with regard to the medical opinions, the court concludes that the ALJ adequately articulated her reasons for the weight she assigned to each opinion, and that the ALJ's conclusions were both in accordance with applicable law and supported by substantial evidence.  Claimant criticizes the ALJ for pointing out that much of Dr. Morrow's testimony consisted of summary responses to counsel's leading questions, stating that "[t]he decision by the ALJ to ignore

---

[24] Tr. 75-81.

[25] Tr. 26.

objective evidence supporting Plaintiff's claims on the basis of 'leading questions' was groundless and improper."[26] The record does not support claimant's assertion that the ALJ ignored objective evidence. To the contrary, the record reflects that the ALJ thoroughly considered *all* the evidence in the record. The fact that Dr. Morrow responded to counsel's leading questions did not appear to impact the ALJ's decision about how much weight to afford Dr. Morrow's opinion as much as other factors. For example, the ALJ considered Dr. Morrow's treating relationship with claimant, his field of specialty, his access to claimant's other medical records, the course of treatment he pursued, and the consistency of Dr. Morrow's opinions with the evidence as a whole.[27] Those are permissible factors to consider, *see* 20 C.F.R. § 404.1527(d), and the ALJ's conclusions were supported by substantial evidence.

The ALJ also did not err in giving more weight to the opinions of Dr. Estock, the non-examining state agency physician, and Dr. Oberlander, the medical expert who testified during the administrative hearing, than he gave to Dr. Morrow's opinion. Social Security regulations provide that the opinions of state agency psychological consultants are entitled to substantial consideration. *See* 20 C.F.R. §§ 404.1527(e)(2)(i) & 416.927(e)(2)(i) (stating that, while the ALJ is not bound by the findings of a State Agency psychological consultant, the ALJ should consider such a

---

[26] *See* doc. no. 13 (claimant's brief), at 9 (alteration supplied, emphasis in original).
[27] Tr. 26.

consultant to be both "highly qualified" and an "expert" in Social Security disability evaluation). *See also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) ("The Secretary was justified in accepting the opinion of Dr. Gordon, a qualified reviewing physician, that was supported by the evidence, and in rejecting the conclusory statement of Dr. Harris, a treating physician, that was contrary to the evidence."); *Surber v. Commissioner of Social Security Administration*, No. 3:11–cv–1235–J–MCR, 2013 WL 806325, *5 (M.D. Fla. March 5, 2013) (slip copy) ("State agency medical consultants are non-examining sources who are highly qualified physicians and experts in Social Security disability evaluation, and their opinions may be entitled to great weight if supported by evidence in the record.").

## B.    Failure to Seek Treatment

Claimant also argues that the ALJ improperly considered her failure to seek more aggressive treatment in evaluating her credibility.  The ALJ's findings regarding claimant's treatment history are as follows:

> The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.  The record reflects significant gaps in the claimant's history of treatment.  Since the alleged onset, almost all of her treatment has been rendered by a general practitioner.  She did not follow up with her specialists despite a severe heart condition with very severe allegations of passing out and migraines.  She only saw her cardiologist once in the last five years. There is no other treatment from the emergency room or hospital despite the claimant's extreme complaints.

The claimant's use of medications does not suggest the presence of impairments that are more limiting than found in this decision. At the time the application was filed she was only taking Zebeta . . . . The claimant's current medications are Xanax (anxiety), Phenobarbital (seizures), Bisoprolol/Zebeta (heart), Propranolol (blood pressure/heart), Lortab (headaches/back pain), and Vitamin D. All medications were prescribed by Dr. Morrow, a family practitioner. She was taking Phenobarbital for "seizures" but there was no evidence of seizures in the record. She noted there were some medications prescribed by her cardiologist and "thyroid" doctor but she was not able to get these refilled due to her lack of insurance . . . . The claimant testified medications helped control her symptoms. There is evidence that the claimant has not been entirely compliant in refilling prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application. The claimant's alleged side effects are mild and would not interfere with the claimant's ability to perform simple, unskilled work activities in any significant manner.

The claimant failed to follow-up on recommendations made by doctors, such as further testing to determine what is causing her symptoms, mental health treatment, and radioactive iodine treatment. This suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal.

The claimant never attempted to find treatment from a free or subsidized mental health clinic. She did not want to seek counseling because she was ashamed, even though she testified to disabling symptoms. She was not seeking treatment from specialists or having further testing for her heart or for passing out because she could not afford and did not have insurance. However, she testified that she had some form of insurance through her mother until October 2011. Even when the claimant was receiving disability benefits and had Medicaid, she was not compliant with treatment given that she did not follow up at the MVP Center between August 2005 and November 2010. Even so, given the extreme symptoms the claimant described, such as passing out three to four times a week, it seems unlikely she would not seek treatment and testing that could drastically improve her functioning,

which makes her testimony less credible.

> To obtain disability benefits, a claimant must follow treatment prescribed by his or her physician if the treatment would restore the claimant's ability to work.  If the claimant does not follow prescribed treatment without a good reason, the claimant will not be found disabled.  The regulations do not list financial inability to pay for treatment as an acceptable excuse for failing to follow prescribed treatment (20 C.F.R. §§ 404.1530, 416.93).[28]

Additionally, when discussing the GAF score assessed by Dr. Blotcky, the ALJ stated that if claimant received mental health treatment, her GAF score would be expected to improve.[29]

It appears that the ALJ may have confounded two separate standards for considering a claimant's failure to follow treatment.  On the one hand, Social Security regulations provide that a claimant's treatment history is a permissible factor *for evaluating a claimant's credibility.  See* 20 C.F.R. §§ 404.1529(3)(v), 416.929(3)(v).  As an entirely separate matter, the regulations also inform claimants that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  20 C.F.R. §§ 404.1530(a), 416.930(a) (alteration supplied).  If a claimant does not "follow the prescribed treatment without a good reason, [the Commissioner] will not find [him] disabled or blind or, if [he is] already receiving benefits, [the Commissioner] will stop paying [him] benefits."  20

---

[28] Tr. 22.

[29] Tr. 21.

C.F.R. §§ 404.1530(b), 416.930(b)(alterations supplied).   The scope of acceptable

"good reasons" is very limited and includes reasons such as:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. §§ 404.1530(c), 416.930(c).

While the ALJ cited §§ 404.1530 and 416.930, it does not appear that she

actually found claimant to be non-disabled *as a result of claimant's failure to follow*

*treatment.*  If that had been the ALJ's decision, she likely would have made findings

that the evidence supported claimant's disability, but nonetheless concluded that

claimant was non-disabled as a result of her failure to follow treatment that would

restore claimant's ability to work.  Instead, all of the ALJ's findings relate to the effect

of claimant's failure to follow treatment on the ALJ's evaluation of claimant's

credibility.  Thus, despite the ALJ's citation of §§ 404.1530 and 416.930, it appears

that the ALJ actually considered claimant's failure to obtain treatment under §§ 404.1529(3)(v) and 416.929(3)(v) instead.  As such, claimant's reliance on Social Security Ruling 82-59 is misplaced, as that Ruling concerns disability determinations under §§ 404.1530 and 416.930.

Claimant also asserts that the ALJ improperly considered her failure to seek additional treatment in light of the fact that she was unable to afford such treatment. It is true that "poverty excuses [a claimant's] noncompliance" with medical treatment. *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988) (alteration supplied).  Thus, "while a remediable or controllable medical condition is generally not disabling, when a 'claimant cannot afford the prescribed treatment *and can find no way to obtain it,* the condition that is disabling in fact continues to be disabling in law.'" *Id.* (quoting *Taylor v. Bowen,* 782 F.2d 1294, 1298 (5th Cir. 1986)) (emphasis supplied).  Here, there is no evidence that claimant attempted to obtain care despite her lack of medical insurance and inability to afford treatment.  To the contrary, claimant testified during the administrative hearing that she had not sought counseling from a psychologist or social worker because she was ashamed to try, and because the thought of seeking counseling made her "feel more worse than I already do."[30]  The record also indicated that, even during periods of time when claimant had some type of health insurance coverage through her mother or through Medicaid, she did not seek any more

---

[30] Tr. 59.

19

aggressive treatment for her physical or mental conditions.[31]

Finally, claimant argues that it was improper for the ALJ to hold claimant's failure to seek treatment against her, because claimant's inability to seek proper treatment for her mental disorders might have been the result of the mental disorders themselves.  Claimant relies upon Judge Guin's opinion in *Bennett v. Barnhart*, 288 F. Supp. 2d 1246 (N.D. Ala. 2003).  There, Judge Guin held that a claimant's failure to follow her treating physician's recommendation to seek additional treatment from a psychiatrist was "insufficient to allow a rational fact finder to conclude the plaintiff did not suffer depression at a disabling level as described by the two consulting psychologists."  *Id.* at 1254-55.  Specifically, one of the consultative examiners had noted that the claimant's failure to maintain an active involvement in mental therapy was evidence of her impaired insight and judgment.  *Id.* at 1255.  As Judge Guin explained, "the symptoms of mental disorders often include an inability to seek out the treatment and help necessary to treat such disorders."  *Id.*

Other Circuit Courts of Appeal have held, like Judge Guin, that a claiamnt's lack of medical treatment for a mental disorder cannot serve as a basis for finding that the disorder was not severe.  *See Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996) ("[T]he fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which

---

[31] Tr. 49-50.

to conclude that Dr. Brown's assessment of claimant's condition is inaccurate.")
(alteration supplied); *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir. 1989)
("Appellant may have failed to seek psychiatric treatment for his mental condition, but
it is a questionable practice to chastise one with a mental impairment for the exercise
of poor judgment in seeking rehabilitation."); *Beasich v. Commissioner of Social
Security*, 66 F. App'x 419, 429 (3rd Cir. 2003) (quoting *Nguyen* and *Blankenship*).
The Eleventh Circuit, in contrast, has repeatedly considered a claimant's failure to
seek mental health treatment as a basis for rejecting a finding of mental disability.
*See, e.g., Moncrief v. Astrue*, 300 F. App'x 879, 881 (11th Cir. 2008); *Baxter v.
Barnhart,* 165 F. App'x 802, 805 (11th Cir. 2006); *Ogranaja v. Commissioner of
Social Security*, 186 F. App'x 848, 849-50 (11th Cir. 2006). In light of those Eleventh
Circuit decisions, this court declines to follow the lead of the persuasive authority in
*Bennett*. It was not improper for the ALJ to consider claimant's failure to seek mental
health treatment in evaluating the seriousness of claimant's mental health condition.
Moreover, the ALJ's conclusions about claimant's mental abilities were supported by
substantial evidence.

## C.    Conclusion and Order

Based on the foregoing, the court concludes the ALJ's decision was based upon
substantial evidence and in accordance with applicable legal standards. Accordingly,

the decision of the Commissioner is AFFIRMED.  Costs are taxed against claimant.

The Clerk is directed to close this file.

DONE this 13th day of March, 2014.

_____
United States District Judge